## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

**JAMES SOLIDAY,**

        **Plaintiff,**

**v.**                             **CASE NO. 2:09-CV-807-FtM-29SPC**

**7-ELEVEN, INC.**

        **Defendant.**

_____/

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, JAMES SOLIDAY (hereinafter "Soliday") by and through his undersigned counsel, pursuant to Fed.R.Civ.P. 56, files this Memorandum of Law in Opposition to Defendant's, 7-ELEVEN, INC. (hereinafter "Defendant") Motion for Summary Judgment (Doc. 69) and in support thereof states as follows:[1]

### I.      STATEMENT OF FACTS

Soliday has a disability. (*James Soliday Affidavit, ¶ 1*) (*Amended Complaint, ¶¶ 12-16*). He began employment with Defendant in 1982. (*Soliday Aff., ¶ 2*) (*Amended Complaint, ¶ 17*). He first requested the use of text pagers to accommodate his hearing impairment in 1999. (*Soliday Aff., ¶ 7*) He has never had an overall unsatisfactory performance appraisal in his twenty-six (26) years of employment with Defendant. (*Soliday Aff., ¶ 3*). In 2006 he was assigned to a difficult subgroup of stores. (*Soliday Aff., ¶ 4*). Store No. 32209 ("32209") was a "high risk" store. (*John Chase Depo., 80:22-81:1*). High risk means a location in a high crime, low income area. (*Adam Slepian Depo., 22:14-23*). In fact, Soliday's subgroup was comprised

---

[1] Soliday agrees to dismiss his claims of age discrimination, Counts VII and VIII of the Amended Complaint.

of mainly high risk stores.  (*James Soliday Depo*, 49-61).  The subgroup was referred to as the "East Side of Ft. Myers."  (*David Harding Volume 2*, 52:19-24).  The subgroup was known by all FC's in the market to be particularly problematic in the areas of image and shortage. (*Harding Volume 2*, 53:5-9; 96:2-7).

Shortage is cash merchandise leaving the store that's not paid for.  (*Harding,* 10:1-4).  All stores have shortage, some more than others.[2]  (*Chase,* 30:15-21) (*Harding,* 10:5-10) (*Slepian*, 31:11-17).   Possibly *all* of Hutchison's FC's have experienced at least one Level III shortage. (*Hutchison*, 62:11-21).  Shortage control verification by the FC is referred to as a "CSA", or Current Situation Analysis.  (*Chase,* 32:21-33:12).  A CSA is not required in every Quality Visit ("QV"); only if it's a Level III shortage store, where it must occur at least once a week.  (*Chase,* 84:15-85:3) (*Hutchison  30(b)(6)*, 133:13-20).  The FC must do a CSA once month for a Level I shortage store, twice a month for a Level II, and once a week for a Level III.  (*Harding*, 14:1-6). It is ultimately the Store Manager's ("SM") responsibility to ensure that proper shortage controls are being used.  (*Harding Volume 2*, 59:7-14) (*Hall*, 75:4-7).  There are situations where shortage controls can be verified by the FC on one day, and then when the FC returns two days later he finds that the SM is not using the same shortage controls that were just verified two days earlier.  (*Harding Volume 2*, 59:25-60:10) (*Harrison*, 132:3-11) (*Hall*, 58:8-14).[3]  The FC would have no way of knowing until his next scheduled visit to the store.  (*Harrison*, 132:12-15). Documenting SM's for failing to use shortage controls is a common occurrence.  (*Harding Volume 2*, 63:5-9).  Managers need to be held accountable for poor performance.  (*Hall*, 81:3-6). Managers and staff are terminated because of this on some occasions.  (*Harding*, 32:20-33:7).

---

[2] During Slepian's nine years as a Store Manager, all stores except one of his has experienced a Level III shortage. (*Slepian*, 31:18-24).
[3] This in fact occurred with Loss Prevention Specialist Tim Hall when he was a Field Consultant.  (*Hall*, 58:15-24).

QV requirements have changed many times over the last several years. (*Harding*, 16:6-15) (*Slepian*, 35:14-21). There was a change in the Florida Division leadership in February 2008 when Brad Jenkins ("Jenkins") became Vice President. The QV requirements at that time changed from two a week to one a week. (*Hutchison*, 138:10-21) (*Hutchison 30(b)(6),* 127:5-8). There is nothing in writing establishing a required length of a QV. (*Hutchison 30(b)(6), 127:19-35) (See also Ex. 1 hereto*). The length depends on the store. (*Chase,* 82:16-17). FC's have the flexibility and discretion to adjust the length of the QV depending on the store. (*Harding*, 15:10-16) (*Hutchison 30(b)(6), 144:7-9).* (*Soliday Aff., ¶ 5*). The QV process might take shorter time the more familiar the FC is with the store. (*Harding Volume 2,* 32:5-12) (*Soliday Aff., ¶ 5*). FC's have been instructed that the content of the QV is more important than the length of time of the QV. (*Harding*, 15:17-22) (*Hutchison*, 140:12-141:12) (*Soliday Aff., ¶ 5*). Part of the QV takes place before the FC even gets to the store. (*Soliday Aff.*, ¶ 6). After Soliday's termination, Chase's QV's were less than one (1) hour long. (*See Declaration of Marvin Wood, ¶ 6*).

Soliday was John Chase's ("Chase") supervisor while he was the SM at 32209. (*Chase,* 13:12-14:4). Chase communicated with Soliday by pager. (*Chase,* 116:3-5). He did so frequently, on a daily basis, and could not count the number of times because it was so much. (*Chase,* 116:6-17). Soliday relied on the text pager to communicate with his SM's. (*Soliday Aff., ¶ 7*) (*Chase,* 116:18-21). Chase would text Soliday if he wanted to get ahold of him quickly. (*Chase*, 117:7-9). There were times when Harding needed to communicate quickly with his SM's. (*Harding*, 45:22-25). An example would be if somebody was hitting the stores with counterfeit $100 bills. (*Harding*, 46:2-7). Harding would rely on the telephone to communicate with his SM's. (*Harding*, 46:8-10). Harding observed Soliday relying on text pagers much the same way Harding would rely on a telephone. (*Harding*, 46:11-23). Adam

Slepian ("Slepian"), one of Soliday's SM's, communicated with Soliday by text pager many times daily about anything going on in the store that needed to get to him immediately. (*Slepian*, 51:10-21). Soliday would set gas prices by pager. (*Slepian*, 71) (*Hutchison*, 83:15-21). At the time of Hurricane Charley, Slepian was unable to communicate with Soliday because the pagers were down. (*Slepian*, 47:8-48:20). He didn't know whether or not he needed to close the store. *Id.* He wanted to get to his family, but was unable to do so. (*Slepian*, 50:5-23).

Bill Sowl ("Sowl") is the Division Finance Manager for the Florida Division. (*Sowl Depo.*, 10:2-6). Jenkins called Sowl into his office in April 2008 and said the company was projecting a bad year and was looking for ways to save money, and so the decision was made to discontinue pagers.[4] (*Sowl,* 14:23-15:7; 18:14-17). They determined that the text pagers were not essential to conduct business, were ineffective and a nuisance, so they could be eliminated. (*Hutchison*, 67:9-20). Sowl looked into the cost. (*Sowl*, 17:8-13). He didn't do a high level analysis, but rather just a quick "snapshot" to see what the costs were, which he estimated at $250,000 for the entire Florida Division. (*Sowl*, 17:14-18:13). It was difficult to pinpoint an exact figure. (*Sowl*, 6-7). He came up with a revised figure of $150,000 in August 2008. (*Sowl*, 19:12-20). After he reported the initial figure of $250,000 to Jenkins, Jenkins reiterated that he wanted to stop the program. (*Sowl*, 21:15-22). Jenkins wanted to kill the program as quickly as possible to get the financial savings. (*Sowl*, 21:23-22:1). The total cost of the pagers for Market 1554 in 2007 was $26,363. (*Sowl*, 24:16-19). Market 1554 at the time consisted of 92 stores. (*Sowl*, 23:16-19). Sowl did not know what the pagers were being used for. (*Sowl*, 26:12-22). Jenkins never explained the purpose of the text pagers to Sowl. (*Sowl*, 26:24-27:3). Sowl was not asked to look into what effect discontinuation of the text pagers might have on employees. (*Sowl*, 27:8-11).

---

[4] Hutchison says he was the one who first questioned the necessity of the pagers. (*Hutchison*, 69:4-11).

Sowl was involved in a series of email communications with Jenkins and Dot Thompson ("Thompson"), the Administrative Assistant for Market 1554, regarding elimination of the text pagers. (*Ex. 2 hereto*). By email of May 14, 2008, Sowl asked Division Administrative Assistants what the status was on returning all of the pagers. (*Sowl*, 44:3-15) (*Ex. 2, Bates 7550*). Thompson responded by advising Sowl that most of Market 1554's pagers had been returned, but there was "one exception and that is to Jim Soliday's subgroup. . . ***Because of his hearing impairment, he can't use a cell phone***." (*Sowl*, 49:12-21) (*Ex. 2, Bates 7550*). Sowl did not report back to Jenkins after receiving this email from Thompson. (*Sowl*, 51:21-52:5). He reported back to Jenkins that "[n]o markets have said they are having any issues returning [the pagers]." (*Sowl*, 53:54:3) (*Ex. 2, Bates 7544*). He never reported back to Jenkins that there was a problem with Soliday's returning the text pagers. (*Sowl*, 56:10-57:14). Sowl never made any point to compute the costs of the pagers to Soliday and his subgroup to continue using them. (*Sowl*, 67:9-13). Jenkins never asked Sowl to research this. (*Sowl*, 67:20-23). Hutchison never asked for these computations either. (*Sowl*, 67:24-68:3). He never offered Soliday the option of paying for the pagers for himself and his subgroup. (*Hutchison*, 87-88) (*Soliday Aff., ¶ 11*).

FC's were informed by Hutchison at a staff meeting that the text pagers were being eliminated. (*Harding*, 50:3-10) (*Soliday Aff.*, ¶ 7). When the pagers were eliminated, Hutchison said that they were eliminated because franchisees would not be issued pagers. (*Chase* 117:23-118:2) (*Soliday Aff., ¶ 7*). Soliday immediately told Hutchison that elimination of the pagers would cause a hardship because that's how he communicated with his SM's.[5] (*Soliday Aff., ¶ 7*). Soliday was concerned with how he was going to communicate with his stores. (*Harding*, 50:11-15). At the staff meeting Soliday asked Hutchison to allow him to keep the pagers for him

---

[5] Hutchison claims Soliday never , "not once", said anything about the elimination of the pagers at this meeting. (*Hutchison*, 71:7-12; 71:24-72:14). He further claims that Soliday never explained his reliance on the text pagers because of his hearing impairment, and that Soliday is not telling the truth. (*Hutchison*, 73:15-74:3).

and his group of stores.  (*Harding Volume 2*, 18:21-25) (*Soliday Aff. ¶ 7*).  Hutchison said they

weren't going to have text pagers in the market any longer.  (*Harding Volume 2*, 19:7-9).  Based

on the years that Harding had worked with Soliday, Harding could understand where Soliday

was concerned.  (*Harding*, 50:16-22).  Hutchison never had any one-on-one discussions with

Soliday over the text pagers.  (*Hutchison*, 77:15-18).  Hutchison didn't even know if Soliday

could communicate normally on a cell phone.  (*Hutchison*, 79:16-18).  Hutchison told Soliday to

find a solution utilizing equipment that was already in use at the stores.  (*Soliday Aff., ¶ 7*).

Neither Hutchison nor anyone else in 7-Eleven management questioned Soliday, discussed with

him or otherwise interacted with him to assist him in finding a compatible replacement for the

text pagers.  (*Soliday Aff., ¶ 11*).  No one from 7-Eleven management discussed the cost of

pagers for Soliday and his subgroup or offered to let him keep the text pagers at his own

expense.  (*Soliday Aff., ¶ 11*).

     Soliday was aware that Market Managers in the Florida Division were using Blackberrys.

(*Soliday Aff., ¶ 8*).  He subsequently asked Thompson how the Blackberry interfaced with

equipment already in use in the stores.  *Id.*  She explained it to him, and since that was the only

mobile communication device available from 7-Eleven under the restriction of "there will be no

pagers" and "using equipment already in the stores" Soliday asked if he could have one.  *Id.*

Soliday was subsequently told that he had to purchase the Blackberry and pay for its monthly

expense. *Id.*   He purchased the Blackberry as directed with a check.  (Soliday Aff., ¶ 9).   He

also had to pay for his cell phone used for texting his SM's.  *Id.*   After the Blackberry arrived

Thompson assisted Soliday in getting it turned on and functioning.  (*Soliday Aff., ¶ 10*).

Afterward she asked him if it was working and he told her it was.  *Id.*   This was not in the

context that it was a compatible replacement for text pagers, but rather that it was simply

operating.  *Id.*   Hutchison never asked Soliday if it was a compatible replacement for the text pagers.  *Id.*

      The elimination of text pagers had more of a negative effect on Soliday than it did on Harding.  (*Harding Volume 2*, 24:25-25:3).   Slepian was more upset than Soliday over elimination of the text pagers because Soliday got a cell phone that had a regular keyboard like the text pager, while Slepian had a regular cell phone.[6]   He was not very good at texting on that phone.  (*Slepian*, 53:25-54:6).   Slepian's communication with Soliday was less frequent after elimination of the text pagers.  It was more one-way communication from Soliday to Slepian.  (*Slepian*, 55:11-15).   Slepian was able to read the cell phone texts, just not the greatest at responding to them.   (*Slepian*, 55:16-25).   Communications with Soliday were more difficult without the text pagers.  *Id.*

      Before Hutchison's arrival, the prior Market Manager, Joe Sucharzewski ("Sucharzewski"), had some conference calls, usually during hurricanes.  (*Harding*, 52:11-14).   After Hutchison arrived, he was holding conference calls much more frequently.  (*Harding Volume 2*, 5:16-20).   It was as many as five per week.  (*Soliday*, 120) (*Harding*, 6:19-23) (*Hutchison*, 97:3-6).  The FC's would dial in to the call from wherever they were.  (*Hutchison*, 97:20-98:1).   Soliday complained about the conference calls because it was disrupting his schedule and asked for Hutchison to stop them.[7]  (*Soliday Aff., ¶ 13*).  Hutchison was aware that the conference calls interfered with the FCs' QV's.  (*Hutchison*, 100:20-25).  He has no idea how much time was taken out of Soliday's day to attend the conference calls.  (*Hutchison*, 101:2-10).  Hutchison sometimes conducted conference calls on Saturdays where the FC's would typically

---

[6] Soliday had a QWERTY keyboard on his cell phone, whereas Slepian and Soliday's other SM's had regular cell phones where one has to hit a number on the key pad a certain number of times to produce the intended letter or number.  (*Slepian*, 54:11-19).

[7] Hutchison, as with the text pagers and fax machines, claims that Soliday never expressed any objection to the disruption to his schedule caused by the conference calls.  (*Hutchison*, 100:4-20).

be at home.  (*Harding Volume 2*, 8:5-11).  On those occasions, Harding could participate from home over the telephone.  (*Harding Volume 2*, 8:12-16).  Soliday, on the other hand, would have to leave his home and travel to one of his stores so that the SM could relay communications.  (*Soliday Aff., ¶ 14*) (*Harding Volume 2*, 8:17-9:7).  Conference calls caused an interruption to the task at hand.  (*Harding Volume 2*, 13:12-16).  If the FC was in the middle of a QV, he would have to stop where he was at and get on the phone for whatever period of time it took.  (*Harding Volume 2*, 13:17-24).  Soliday told Hutchison in a roundtable meeting that the frequency of the conference calls was an obstacle to him.  (*Harding Volume 2*, 94:8-22).  He conveyed to Hutchison the difficulty of the conference calls was that he had to rely on someone else to relay the information to him.  (*Harding Volume 2*, 99:2-19).  Hutchison reduced the frequency of conference calls six to eight months after Soliday's termination.  (*Soliday Aff., ¶ 13*) (*Harding Volume 2*, 14:11-16).

Hutchison also announced the elimination of fax machines.  (*Harding*, 52:18-23).  He never discussed the subject one-on-one with Soliday.[8]  (*Hutchison*, 92:15-18).  Harding knew that Soliday relied on fax machines a lot.  (*Harding*, 53:12-14).  Soliday spoke up and told Hutchison how he relied on fax machines given his hearing impairment.  (*Soliday Aff., ¶ 25*) (*Harding Volume 2*, 16:2-15).  The discontinuation of fax machines had more of a negative effect on Soliday than it did on Harding.  (*Harding Volume 2*, 25:4-9).

In January 2008 Soliday discovered how the SM at 32209, Sam Hilwy ("Hilwy"), was embezzling from Defendant, reported it to Defendant's Loss Prevention Department and terminated Hilwy.  (*Soliday Aff., ¶ 19*).  Prior to this incident, the store was a smooth running operation with a highly regarded manager at the helm in Hilwy.  (*Soliday Aff., ¶ 20*) (*Harding*

---

[8] Hutchison also claims, contrary to Soliday's testimony, that Soliday never complained about his decision to eliminate fax machines.  (*Hutchison*, 93:2-5).

*Volume 2*, 36:10-16).  From January 27, 2006 through March 7, 2008 the store had no history of Level III shortages.  (*Soliday Aff., ¶ 20*).   An FC was required to randomly check shortage controls at a Level I store only once per month.   *Id.* During that check as it relates to Digital Video Recording ("DVR")  review, Soliday was instructed to view "questionable" voids, aborts and no sales.  *Id.*   With only a Level I shortage history, a "questionable" void would be that of an employee, not a SM.  *Id.*  Those were the voids and aborts that Soliday reviewed at 32209 per company guidelines prior to the Level III shortage in March 2008.  *Id.*  Nowhere on the Shortage Control CSA form does it direct an FC to check any payroll registry, compare hours worked of a specific employee, or to search for "ghost" employees.  *Id.*  Soliday did everything that he had ever been instructed to do, yet unfortunately Hilwy's wife went unnoticed on the payroll.  *Id.*

After Hilwy was fired Soliday brought Slepian in to do the changeover in preparation for the incoming SM, Chase.  (*Slepian*, 60:24-61:10; 63:12-25).  During the 3-4 week period before Chase's arrival, Slepian and Soliday worked on the shortage controls, which were not in place when Slepian got there.[9]  (*Slepian*, 64:5-13).  When Slepian left the store, all shortage controls were in place.  (*Slepian*, 68:17-20).  Slepian wrote a statement on March 27, 2008 that he and Soliday on February 7 and 8 made sure shortage controls were in place before the new manager took over.  (*Slepian*, 67:9-14) (*Ex. 3 hereto*).   When Chase came on the scene at 32209, the normal shortage controls were started.[10]  (*Chase* 22:11-14).   Chase recalls reviewing shortage controls at 32209 with Soliday shortly after he arrived.  (*Chase* 23:14-20).  Chase wrote a note on March 13, 2008 acknowledging that he had gone over all of the shortage controls at 32209 with Soliday that morning.  (*Chase* 23:25-34:8) (*Ex. 4 hereto*).   The first audit since Chase's arrival at 32209 showed a shortage of $285 per day, which is very significant.  (*Chase* 25:10-14;

---

[9] The store was without a Store Manager for several weeks after Hilwy's termination.  (*Soliday Aff., ¶19*).

[10] Slepian testified that at the time he left 32209 in February 2008, all shortage controls were **in place** at the store.

32:5-7).    Soliday disciplined Chase for several Level III shortages and for failing to use all

required shortage control tools at 32209.  (*Chase*, 78:13-79:6) (*See also Ex 5 hereto*).

In the latter part of February 2008 Soliday was in the market office picking up supplies

and Human Resources Manager John Harrison ("Harrison") was there.  (*Soliday Aff., ¶ 22*).

Harrison casually asked if they could talk.  *Id.*  They went into Sucharzewski's vacant office and

he asked Soliday about the Hilwy incident at 32209.  *Id.*  Soliday told the story of how Hilwy's

actions were uncovered.  *Id.*  The discussion lasted approximately ten (10) minutes.  *Id.*  There

was no conversation about Soliday's job performance at that meeting, including any warning or

discussion of QV requirements or shortage verification requirements.  *Id.*  There was no

paperwork given or shown to Soliday.  *Id.*

Tim Hall ("Hall") was a Loss Prevention Specialist for Defendant who, at the request of

Harrison, conducted a random CSA[11]   at 32209.[12]   (*Hall*, 21:7-10; 22:8-18; 27:24-28:1).   A

random CSA is a reflection of what the **SM** has or had not done.  (*Hall*, 45:22-25).   A cash

variation log could not be completed if the registers were down.  (*Hall*, 38:21-39:1) (*Soliday Aff.,

¶ 18*) (*Harding Volume 2*, 33:23-36:1).   Chase ***told*** Hall that Soliday had not reviewed shortage

controls since Chase came in as SM.  Hall didn't conclude whether Chase was being truthful or

not.  Chase could have been lying.  (*Hall*, 42).

Shortly after this, Hutchison issued an Interoffice Memo to Soliday on March 26, 2008.[13]

(Hutchison, 108:20-24).  (*Soliday Aff., ¶ 24*) (*See also Ex. 6 hereto*).  He accused Soliday of not

verifying shortage controls at 32209.  (*Soliday Aff., ¶ 24*).  Soliday later provided documentation

---

[11] The CSA reflects what he found the day he was in the store.  (*Hall*, 14:9-13).  It reflects the *current situation* of
the use of inventory shortage control tools by the store operator.  (*Hall*, 24:10-12).
[12] Hall doesn't consider the shortage history at 32209 to be major.  (*Hall*, 34:17-23).  He has evaluated other stores
in Market 1554 with a "much more severe shortage history."  (*Hall*, 35:8-11).  He regularly finds that shortage
controls are not being used properly.  (*Hall*, 46, 10-15).
[13] Hutchison had been the Market Manager and Soliday's supervisor for just a little over a month at this point.

to Hutchison that he had verified all shortage controls during the time in question.  (*Soliday Aff., ¶ 24*).  In order to see if Soliday was verifying shortage controls, Hutchison would look at the CSA's.  (*Hutchison*, 110:20-24).  The CSA in question reflects that Soliday checked shortage controls and keyed them into the system on February 12, 2008.  (*Hutchison*, 117) (*Soliday Aff., ¶ 24*).  Hutchison apologized and told Soliday if he had known of the documentation Soliday had presented, he would not have accused Soliday.  (*Soliday Aff., ¶ 24*).  Soliday requested that he remove the memo from his file, and Hutchison said he would talk to Harrison to get it taken care of.  (*Soliday Aff., ¶ 24*).  Hutchison claims he doesn't remember Soliday presenting him with this CSA as proof that he had verified shortage controls.  (*Hutchison*, 117:1-11).  Hutchison also doesn't remember if he spoke with Chase to see if Soliday did, in fact, verify shortage controls.  (*Hutchison*, 120:18-23).  Hutchison claims that even if shortage controls were in place on March 13, 2008, the date of Chase's statement (*Ex. 4 hereto*), they weren't in place on March 17, 2008, the date of Hall's random CSA.  (*Hutchison*, 121:7-12).

 Hutchison visited 32209 in August 2008 while Chase was the SM.  (*Chase*, 85:4-13).  Hutchison went through the store books and asked Chase a series of questions.  (*Chase, 85*).  He asked Chase why it took so long for Chase to get the Level III shortage situation under control.  (*Chase, 86:12-22*).  Chase told him that customer theft was causing the shortage.  (*Chase, 92:5-15*).  ***Chase also told him that all shortage controls were in place.***  (*Chase, 92:21-25*).  Hutchison asked Chase how long Soliday visited the store, how long the visits lasted, and what Soliday did at the visits.  (*Chase, 93:10-19*).  Chase did not express to Hutchison that he felt that Soliday was not visiting the store enough.  (*Chase, 95:11-15*).  Chase did not have any complaints about Soliday.  (*Chase, 95:20-23*).  Hutchison asked Chase to write a statement concerning visits to the store by Soliday.  (*Chase 97:7-10*) (*See also Ex. 7 hereto*).  Therein,

Chase stated that "the month of July 2008 had the highest quality of visits" in the five months Chase had been at the store. *Id.* Chase also noted that Soliday has visited several other times during the month of July during both second and third shifts. *Id.* With regard to the "areas of concern" on Chase's statement, Chase would not have written those down unless asked to do so by Hutchison. (*Chase,* 101:2-9). Regarding the CSA not being completed during July, Chase simply meant that the CSA was not done while Chase was on duty, not that Soliday had not completed the CSA.[14] (*Chase,* 101:20-102:7). Chase wrote the statement regarding job assignments not being followed up because Hutchison asked him to. (*Chase,* 105:11-5). Hutchison told Chase to write down their conversation. (*Chase ,*105:18-23). Chase didn't make any complaints to Hutchison about Soliday. (*Chase,* 106:22-23). Hutchison also visited Store No. 26567 and requested a written statement from the SM, Asif Qureshi ("Qureshi"). (*Hutchison,* 180:10-14) (*Ex. 8 hereto*). Contrary to Defendant's and/or Qureshi's allegations, Soliday conducted and documented eleven (11) QV's at that store from June 13, 2008 and August 15, 2008. (*Soliday Aff., ¶ 16*).

Harrison is familiar with Defendant's Positive Discipline policy, which was disseminated to all 7-Eleven employees in 2005.[15] (*Harrison,* 22:18-22) (*Soliday Aff., ¶ 23*) (*See also Ex. 9 attached hereto*). The policy can be used to protect the company from lawsuits by making the employee aware of where their performance is not meeting standards, understanding what they need to do to correct the behavior, and understanding that if the behavior is not corrected there will be consequences. (*Harrison,* 24:12-20). A "verbal warning" under the policy is not formal discipline, but it should be documented in writing. (*Harrison,* 25:11-21; 29:16-18) (*Ex. 9, §1.3*).

---

[14] Hutchison speculates that, even though there is documentation that Soliday completed four CSA's at 32209 in July 2008, "it might possibly be that these CSA's were conducted or created after the fact." (*Hutchison,* 185:1-9).

[15] Harrison goes to great length to call this policy a "guideline" despite the fact that it expressly states that "[t]his *policy* establishes broad guidelines designed to achieve fair and equitable treatment for all employees." (*Ex. 9, § 1.2*)

A "written warning is used to identify behaviors that need correction and to get acknowledgment from the employee that they understand that if the behavior is not corrected there will be further steps. (*Harrison*, 30:3-8) (*Ex. 9, §1.3*). A "final warning" is issued if the employee's behavior remains or again becomes acceptable after a written warning has been given. (*Harrison*, 32:2-12) (Ex. 9, §1.3). Defendant follows the process regarding a final warning as it is described in the policy. (*Harrison*, 31:10-14). Termination will occur where an employee *repeats* conduct for which a final warning has been issued. (*Harrison*, 33:20-34:1) (*Ex. 9, §1.3*). The Due Process Checklist ensures that a fair and complete investigation has taken place prior to making a decision regarding termination. (*Harrison*, 37:11-22) (*Ex. 9, §1.3*). The investigation must be supported by appropriate documentation. (*Harrison*, 39:20-25) (*Ex. 9, §1.3*). The proper steps include putting the employee on notice of the behavior that needs to be changed. (*Harrison*, 42:3-8). Due process means that before the final step of termination, all facts have been revealed. (*Harrison*, 43:10-17). The Employee Performance Notice form (EPN) is used in the delivery of all positive discipline. (*Ex. 9, §1.4(c)*).

Harrison claims that it is very common when addressing issues with management that an Interoffice Memo is issued instead of an EPN form. (*Harrison*, 118:5-18). Hutchison issued an EPN Final Warning to Tim Beck ("Beck") on June 3, 2008, explicitly instructing Beck to "execute a high Quality Visit consistent with the method in which he has been coached." (*Harrison*, 149:11-14) (*Hutchison*, 170:9-12) (*See also Ex. 10 hereto, Bates 4536*). Harrison does not know why Hutchison used an EPN form for Beck, but not for Soliday. (*Harrison*, 149:15-23). Hutchison also issued an EPN Final Warning to Todd Mitchell ("Mitchell") on June 20, 2008 in which he expressly stated that "[a] disciplined, consistent QV as coached on numerous occasions is the expectation and the vehicle necessary to deliver the change needed." (*Harrison*, 152:12-17) (*See*

*also Ex. 11 hereto, Bates 4610*).  Hutchison also issued an EPN Final Warning to Marty Frohlich ("Frohlich") on June 24, 2008 in which he expressly stated that "Marty has not been conducting quality visits in his stores at a frequency consistent with market direction" and that "Marty also understands that he is expected to consistently conduct Quality Visits in accordance with direction from the Market Manager." (*Harrison*, 154:8-16) (*Hutchison*, 158:1-8)  (*See also Ex. 12 hereto, Bates 3883*).  Frohlich is still employed by Defendant.  (*Harrison*, 154:19-23).  Pam Glinski ("Glinski") was offered a demotion, instead of termination, despite a well documented history of not adequately performing QV's at her stores.  (*Harrison*, 166:17-168:2) (*Hutchison*, 165:4-9).

Harrison doesn't recall if he reviewed Hutchison's actions to make sure all the "I's" were dotted and "T's" were crossed.  (*Harrison*, 128:21-129:1).  He was aware that Soliday had provided a written rebuttal and had rebutted all of the allegations in Hutchson's March 26, 2008 Interoffice Memo.  (*Harrison*, 129:2-11).  Despite the fact that Slepian and Chase provided written statements that Soliday had verified that the proper shortage controls were in place at 32209, Harrison still believed that the March 26, 2008 discipline was appropriate.  (*Harrison*, 132:16-22).  Harrison did not take any independent steps to verify whether or not the CSA was conducted for the month of July 2008 at 32209 as alleged by Chase in his August 20, 2008 written statement (*Ex. 7 hereto*).  (*Harrison*, 144:7-10).

Harrison also spoke to Jenkins and Hutchison about Soliday shortly ***before*** Soliday's termination.[16]  (*Harrison*, 59:7-23).  This occurred in a car while the three were visiting stores in Ft. Myers.[17]  (*Harrison*, 60:3-10).  Harrison claims he read written statements from Slepian, Chase

---

[16] Harrison also claims that there was a history of months and years of coaching and counseling to Soliday, and that Soliday had received poor performance evaluations for ten years.  (*Harrison*, 61:20-62:5; 64:12-14).  He is not aware of any notes that document these alleged verbal warnings as required by the Positive Discipline policy.  (*Harrison*, 72:5-10).  The only way he knows they occurred is from his discussions with the Market Manager.  (*Harrison*, 72:11-15).

[17] Contrary to Harrison, Hutchison claims they spoke over the telephone.  (*Hutchison*, 134:6-16).

and Qureshi during this car ride a couple of days before Soliday's termination.  (*Harrison*, 75:2-13).   Soliday was terminated for willful refusal to perform job duties.  (*Harrison*, 99:6-8).   He wasn't performing up to the standard of the(QV.  (*Harrison*, 99:20-100:2).   Harrison is not aware of anything in writing to Soliday, at the time the March 26, 2008 Interoffice Memo was issued by Hutchison, which previously had reprimanded or otherwise instructed Soliday on performing QV's.[18]  (*Harrison*, 122:17-134:4).   Hutchison never gave Soliday a verbal warning for inadequate QV's.  (*Hutchison*, 150:21-151:5; 153:3-5).   He also never issued a written warning to Soliday regarding the QV process.  (*Hutchison*, 155-156).   He also never gave Soliday a final warning for failing to conduct QV's before he terminated Soliday.  (*Hutchison*, 157:2-6).   Neither he nor anyone else reviewed any marketwide or statewide FC rankings before terminating Soliday, relied on those rankings in terminating Soliday, or ever discussed those rankings with Soliday.[19]  (*Hutchison  30(b)(6), 51-54, 159*) (*Soliday Aff., ¶ 12*).   They were not even a reason for Soliday's termination.  (*Hutchison  30(b)(6), 57*).   Hutchison doesn't know why he didn't consider a demotion for Soliday as he did for Glinski.  (*Hutchison*, 165:10-17).   After Soliday's termination, Chase took over Soliday's position as FC assuming control of Soliday's subgroup of stores.  (*Chase* 43:23-44:1) (*See also, Ex. 13 hereto*).[20]   Chase kept Soliday's subgroup until May 2009, at which time he assumed responsibility of another subgroup of stores in Port Charlotte.  (*Chase*

---

[18] Defendant's Answer to Interrogatory No. 6 states that at the time "Hutchison issued the performance notice to Plaintiff, he again informed Plaintiff of the need for thorough Quality Visits ("QV's") and to conduct all the steps of a QV each time."  (*See Ex. 14 hereto*).  Yet there is no written evidence to support this despite Defendant's requirement to document it per the Positive Discipline policy.

[19] During discovery, Defendant objected to Soliday's requests for company documentation beyond Market 1554, asserting that it was not relevant.  Further, Defendant never provided these FC rankings to Soliday during discovery despite Soliday's First Request for Production No. 43 for "documents that support your contention that Plaintiff failed to perform his job duties, failed to properly conduct store visits, failed to properly conduct shortage verifications, or otherwise failed to properly perform the functions of his job."  A party cannot assert relevance as a sword and a shield by selectively using documents to prove a point without allowing an opponent to challenge the assertion.  Frontier Refining, Inc. v. Gorman-Rupp Co., 166 F.3d 695, 704 (10th Cir. 1998).

[20] Ex. 13 is the Store List for Market 1554 from August 2008 to May 2009.  The lists for August 2008 (Bates 3082) and September 2008 (Bates 3086) reflect that Chase in September had the same list of stores that Soliday had in August.

46:19-47:1). He requested the transfer from his supervisor, Market Manager Terry Hutchison, because the new subgroup was closer to his home in Port Charlotte. (*Chase* 73:24-74:19). Despite having at least 5 Level III shortages as a FC at several stores under his supervision, including a very significant shortage of $286, Chase received the requested transfer back to his home in Port Charlotte.[21] (*Chase* 43:2-12; 48:9-24; 57:25-58:6).

Harding had five (5) stores under his supervision in 2008 that had Level III shortages. (*Harding Volume 2*, 55:6-14) (*See also Ex. 15 hereto*). Harding is familiar with the DVR system at Defendant's stores. (*Harding Volume 2*, 25:11-13). It is not possible for someone to review a DVR and determine everything that a FC has done or not done with respect to a QV. (*Harding Volume 2*, 25:18-22; 32:14-23). There are portions of the QV that occur outside the store such as surveying the parking lot, perimeter of the property, gas pumps, signage and dumpster area. (*Harding Volume 2*, 25:23-27:3). Harding has conducted some portions of his QV on the third shift. (*Harding Volume 2*, 27:13-15). 5:4-9). Harding was the liaison between the audit company, Quantum, and Defendant's Loss Prevention Department. (*Harding Volume 2*, 49:12-15). As part of that responsibility, he had knowledge of shortage at the stores in Market 1554. (*Harding Volume 2*, 50:3-12). On the whole, there was a stark contrast between Soliday's stores and Beck's stores. (*Harding Volume 2*, 25:4-9). Beck had a much more severe history of Level III shortage issues than Soliday did. (*Harding Volume 2*, 52:12-17). Sales were down in Market 1554 in 2008 over the prior year. (*Harding Volume 2*, 86:8-18) (*Soliday Aff. ¶ 21*).

Hall conducted random CSA's at three of Beck's stores within a two month period in April and May 2008 and did not find any evidence that Beck was reviewing shortage controls at ***each*** of

---

[21] Also included in these Level III shortages is the fact that the shortage situation at 32209, which had the significant Level III shortage of $285 while Chase was the SM, but was subsequently brought under control, reverted back to a Level III under Chase's guidance as FC. (*Chase,* 62:20-23).

those stores.[22]  (*Hall*, 93:9-22) (*See also Ex. 16 hereto*).   There is evidence that Beck was not verifying shortage controls "far more" times than Soliday.  (*Hall*, 99:17-23).   Beck was discovered to have child pornography on his company laptop computer.   (*Hall*, 61-62) (*See also Ex. 17 hereto*).  Hall conducted random CSA's at three of Frohlich's stores in March and November 2008 and did not find any evidence that Frohlich was reviewing shortage controls at **each** of those stores.[23]   (*Hall*, 72:18-21; 86:1-9; 89:12-15; 99:4-12) (*See also Ex.18 hereto*).   There is evidence that Frohlich demonstrated greater neglect of shortage controls than did Soliday.  (*Hall*, 100:11-16).  Frohlich is still employed as a FC by Defendant.  (*Hall*, 97:17-18).   He is not disabled. (*Hutchison*, 158:25-159:2).  Hutchison is not aware of any FC's who had a disability.  (*Hutchison*, 159:3-6).   Hall conducted a random CSA of Todd Mitchell's ("Mitchell") store in September of 2008 and did not find any evidence that Mitchell was reviewing shortage controls at the store. (*Hall*, 97:22-98:11).   He had four Level III shortages, one of which was a significant average of $474.05 per day over thirty-four days.   (*Hall*, 96:4-7).  (S*ee also Ex. 19 hereto*).   Mitchell was terminated for purposely lying to management.   (*See Ex. 20 hereto*).   Another FC, Pam Glinski ("Glinski") had one of her SM's report that he had three store bank deposits stolen out of his vehicle.  (*Hall*, 75:10-17)  (*See also Ex. 21hereto*).   It was determined that the SM had taken the money himself.  (*Hall*, 76:1-3).  The total amounted to $29,614.95.  *Id.*  Glinski was not terminated and was later offered a demotion.

---

[22] In fact, at one store Beck had 3 Level III shortages over a four month period, and in another store he had *eleven* Level III shortages over a two year period.

[23] In one instance, the SM reported that Frohlich had verified shortage controls just one time in six months.  (*Hall*, 88:10-19) (*See also Ex. 18, Bates 7615*).

## II.    LEGAL STANDARD

The moving party in a motion for summary judgment must bear the burden of demonstrating that there is no genuine dispute as to any material fact in the case.  Celotex Corp v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265  (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)  The court's focus in reviewing a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997).  Issues of fact are genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party. *Anderson*, 477 U.S. at 247-51, 106 S.Ct. 2510-11.  All facts and reasonable inferences must be viewed in the light most favorable to the non-moving party.  Cruz v. Publix Super Mkts., Inc., 428 F.3d 1379, 1382 (11th Cir. 2005).

## III.    ARGUMENT

### A.  Plaintiff's Disparate Impact Claims.

Disparate impact claims under the ADA are permitted.  Raytheon Co. v. Hernandez, 540 U.S. 44, 53 (2003).  Defendant correctly states that the elimination of the text pagers, elimination of the fax machines, and the high frequency of conference calls constitute the facially neutral practices which had a disproportionate impact on disabled employees.  Defendant argues that (1) Soliday failed to exhaust administrative remedies;[24] (2) that he failed to present statistical evidence; (3) that he failed to show a disproportional impact by these decisions on a *group*; and (4) that Defendant has shown the decisions were justified by business necessity.  For the following reasons, Defendant's argument fails.

---

[24] In response, Soliday incorporates the arguments raised in his response to Defendant's Motion to Dismiss the Amended Complaint.

First, Soliday does not have to show that a *group* suffered discrimination because of a particular policy or practice.  Although disparate impact claims are often brought as class actions, an individual plaintiff can also make out a disparate impact claim.  See*, e.g.,* Bacon v. Honda of America, 370 F.3d 565, 576 (6th Cir. 2004), *cert. denied*, 543 U.S. 1151 (2005).  An individual plaintiff must show that that the facially neutral policy resulted in discrimination that injured the Plaintiff.  Id.  Soliday has identified facially neutral practices of Defendant that had a disproportional impact on him as a disabled individual.  The record is clear that elimination of the text pagers had much more of a negative impact on Soliday than any other FC's because of his hearing impairment.  He was no longer able to maintain consistent, reliable two-way communication with his SM's.  His SM's didn't communicate with him as frequently as they did with the text pagers.  Soliday relied on two-way communication with his SM's in order to do his job in a manner unparalleled by other FC's.  Similar hearing impaired FC's, if there were any, would have also been disproportionately impacted.[25]  Similarly, the practice of frequent conference calls also had a disproportional impact on Soliday as a disabled individual.  Soliday was forced to interrupt his QV's and drive to another location just to participate in the conference calls. This resulted in delays of several hours or more to complete his QV's, among other consequences.[26]  Other hearing impaired FC's, had there been any, would have also been disproportionately affected.

Second, Soliday does not have to come forward with statistical evidence as Defendant contends.  To satisfy the second element of his *prima facie* case, Soliday simply must produce "competent evidence" that shows that the adverse impact falls disproportionately on disabled

---

[25] The elimination of the fax machines affected Soliday the same way.
[26] Remarkably, Defendant targets Soliday's QV's and the fact that Soliday was not spending enough time in the store, and has advanced this as a reason for Soliday's termination, when it was Defendant's own policy and practice of holding frequent conference calls that routinely took Soliday out of his stores during his QV's.

employees.  <u>Armstrong v. Flowers Hospital, Inc.</u>, 33 F.3d 1308, 1315 (11th Cir. 1994).  As stated above, Soliday was the only hearing impaired FC in Market 1554.  He was disproportionately affected.  Because statistical analysis, by its very nature, can never scientifically prove discrimination, a disparate impact plaintiff need not prove causation to a scientific degree of certainty.  <u>Bazemore v. Friday</u>, 478 U.S. 385, 400 (1986).  Soliday has therefore produced competent evidence as contemplated by <u>Armstrong</u>.

Third, Defendant has not established the business necessity defense.  Soliday has testified that he would gladly have paid the approximate $2,300 a year for he and his SM's to keep the pagers.  (*Soliday Aff., ¶ 7*).  Any concern about franchisees having pagers was not legitimate, as Soliday had no franchise stores in his subgroup at the time the pagers were eliminated or any point before his termination.  Defendant is similarly unable to demonstrate the business necessity of frequent conference calls.  Information could have been conveyed in other ways than over the telephone, especially when considering that a hearing impaired employee was significantly inconvenienced on a regular basis.  Further, Soliday can prevail on the disparate impact claim by showing that Defendant's practice is a pretext for discrimination.  <u>Connecticut v. Teal</u>, 457 U.S. 440, 447 (1982).  Pretext is a question of fact for the jury.  <u>Che v. Massachusetts Bay Transp. Authority</u>, 342 F.3d 31, 39-40 (1st Cir. 2003).

**B.  Plaintiff's Disparate Treatment Claims.**

A *prima facie* case of disability discrimination can be established by demonstrating that the plaintiff:  (1) has a disability; (2) is a qualified individual; and (3) was subjected to unlawful discrimination as the result of a disability.  <u>Reed v. Heil Co.</u>, 206 F.3d 1055, 1061 (11th Cir. 2000).  If the plaintiff meets this burden there is a presumption that intentional discrimination has occurred.  <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997).   The presumption

may be rebutted by the employer's articulation of a legitimate, nondiscriminatory reason for its adverse employment action.  Id.  Once the employer offers legitimate, nondiscriminatory reasons for the employment action, the plaintiff must show that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  Id.  The plaintiff may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence*.  Id.  (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1095, 67 L.Ed.2d 207 (1981).

Defendant claims that Beck and Mitchell were terminated for the same reason as Soliday. The record in this case belies Defendant's position.  Hall testified that Beck had a "far more" extensive history of shortage issues at his stores resulting from his failure to verify shortage controls.  Further, before his termination Beck was expressly advised, in a Final Warning on an EPN form consistent with Defendant's Positive Discipline Guidelines, to "execute a high Quality Visit consistent with the method in which he has been coached."  He was further warned that separation may result if he failed to comply.  Moreover, child pornography was found on his company issued laptop computer.  Beck, therefore, was not terminated for the same reason as Soliday.  Similarly, Mitchell also received a Final Warning on an EPN form advising him to conduct QV's properly.  More importantly, Mitchell was terminated for lying to management, something Soliday was never accused of.  Mitchell, therefore, was not terminated for the same reason as Soliday as Defendant contends.

Defendant has repeatedly attempted to mislead the Court that a QV and shortage control verification are one and the same, and that shortage control verification must be done by the FC during every QV.  This is simply untrue.  The evidence has established that shortage control

verification must be done during every QV (i.e., once a week) only if the store is a Level III shortage store. Defendant further attempts to mislead the Court that Soliday was terminated after repeated warnings about inadequate QV's. There is no evidence in Soliday's personnel file or anywhere else on the record that Defendant ever had any issues with Soliday's QV process. Unlike Beck, Mitchell and Frohlich, whose EPN form Final Warnings each specifically referenced inadequate QV's, the unsubstantiated Interoffice Memo Final Warning given to Soliday in March of 2008, which he rebutted with supporting documentation, focused on shortage control procedures, using the word "shortage" four times.[27]

Next, Defendant asserts that it had a "good faith belief" that Soliday had not been conducting shortage control verification at 32209. Once again, the record evidence belies this position overwhelmingly. Soliday provided a written rebuttal, with supporting documentation, proving that he had in fact conducted shortage control verification. The supporting documentation included written statements of the two SM's who were at that store during the time in question, Slepian and Chase, as well as the CSA printout showing that Soliday had keyed in the shortage control verification on the date in question. Defendant, including Hutchison, never conducted any independent investigation to verify whether or not Soliday had done what he was accused of doing. Indeed, Hutchison never even spoke to Chase or Slepian to ask if Soliday had been verifying shortage controls. Instead, Hutchison blindly relied on Hall, who said that Chase simply *told* him that Soliday had not verified shortage controls. Hall also testified that he just writes down what he's told and doesn't verify whether it's true or not.

---

[27]Where the employer has a system of "progressive discipline", pretext is shown if others committed similar offenses but were given progressive discipline, whereas plaintiff was discharged. Busby v. City of Orlando, 931 F.2d 764, 778 (11th Cir. 1991).

A good faith belief defense that has no legitimate factual basis must be rejected. Lowe v. Alabama Power Co., 244 F.3d 1305, 1308 (11th Cir. 2001) (citing Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998). A reasonable juror could infer that Defendant was not motivated by an honest belief that Soliday had not verified shortage controls based upon the lack of evidence of a significant investigation.[28]   Roberts v. Rayonier, Inc., 135 Fed.Appx. 351, 360 (11th Cir. 2005). A reasonable juror could further infer pretext from these facts. Id. When considering that Beck, Mitchell and Frohlich were all warned in writing specifically for QV issues before they were terminated, while Soliday was not, a reasonable juror could find pretext.[29]

A reasonable juror could also find pretext while knowing that Harrison said the discussion over Soliday's termination took place in a car ride, while Hutchison said it was over the phone. The same juror could also infer pretext where Harrison said that he read the written statements of Chase (*Ex. 7 hereto*) and Qureshi (*Ex. 8 hereto*) in that same car ride a few days **before** Soliday's termination when the statements were not even written until **after** Soliday's termination. This same juror could also find pretext given Defendant's accusation that Soliday's failure in his "job responsibilities has resulted in a substantial loss of valuable financial resources" while Glinski's failure in her job responsibilities resulted in a far greater financial loss, yet she was offered a demotion despite her documented history of inadequate QV's. Defendants' own inconsistencies, together with overwhelming evidence that Soliday did not do

---

[28] To the extent that Hutchison recommended Soliday's termination to Harrison and/or Jenkins, and they relied on that recommendation without performing any independent investigation, Soliday will rely on a cat's paw theory. LLampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1250 (11th Cir. 1998).

[29] In the context of an employee who has been terminated for alleged violations of a company work rule, the Eleventh Circuit has written that "the 'work rule' defense is arguably pretextual when plaintiff submits evidence (1) that she did not violate the cited work rule, or (2), that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d at 1354, 1363 (11th Cir. 1999) ( citing Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1499 (11th Cir.1991)); see also Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1563 (11th Cir. 1987) (plaintiff demonstrated pretext where she showed she complied with work rule and that employer knew she had complied).

what he was accused of doing, at a minimum creates a triable issue as to pretext. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (raising a question about the correctness of facts underlying Defendants' explanation while impugning Defendants' honest belief creates a triable pretext issue). A plaintiff's burden of proving that the employer's proffered explanation is pretextual can be met by discrediting the employer's proffered explanation. Watkins v. Sverdrup Technology, Inc., 153 F.3d 1308, 1314 (11th Cir. 1998). "Under this. . . approach, plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all those reasons] unworthy of credence." Combs, 106 F.3d at 1538. Disbelief, particularly when accompanied by a suspicion of mendacity in the employer's proffered reasons, in tandem with the plaintiff's *prima facie* case, is sufficient to permit the factfinder to infer discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

### C. Reasonable Accommodation Claims.

Contrary to Defendant's assertion, Soliday was not reasonably accommodated by Defendant. He did not request a Blackberry. He requested that he be permitted to keep the pagers for himself and his subgroup (as well as the fax machines). His request was denied. Defendant instructed him to come up with his own solution utilizing equipment/technology already in use by Defendant. Soliday by default chose the Blackberry. It was not a comparable solution. Soliday had to pay for both a Blackberry for email capabilities, and a cell phone with limited texting capabilities, on his own. If the employee needs an accommodation, the employer must engage in an interactive process. Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003). An employer impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good

faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith.  Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002), citing Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 165 (3d Cir. 1999).  Defendant cannot claim undue hardship or business necessity financially because they didn't even know the costs until after Soliday was terminated.  Defendant similarly refused to accommodate Soliday on the conference calls.  Their frequency did not decrease until after Soliday's termination.   Therefore, Defendant denied Soliday's request for a reasonable accommodation.

## IV.    CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment should be denied.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 10, 2011 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  Eric A. Welter, Welter Law Firm, 720 Lynn Street, Suite B, Herndon, Virginia 20170; John F. Potanovic, Esq., Henderson, Franklin, Starnes & Holt, P.O. Box 280, Fort Myers, Florida 33902.

Respectfully submitted,

DARRIN M. PHILLIPS, P.A.
Attorney for Plaintiff
350 Fifth Avenue South, Suite 200
Naples, Florida 34102
(239)  262-7748
(239)  262-7144
E-mail:  DMP@PhillipsLawFL.com

By: **s/ Darrin M. Phillips**
    Darrin M. Phillips, Esquire
    Bar Number:  0062332